## WICKWIRE SPENCER STEEL CORPORATION v. PITTSBURGH STEEL CORPORATION.

(Circuit Court of Appeals, Third Circuit. March 4, 1925. Rehearing Denied May 21, 1925.)

No. 3224.

**Patents ⬉216—Lease and license contract construed.**

   Complainant, owner of patents for inventions embodied in welding machines built by it, by contract rented machines to defendant, with license for their use during the life of the youngest patent listed therein and the right to purchase the machines at the end of the term. The contract further provided that, should complainant acquire patents for improvements embodied in the machines furnished, defendant should have the right to their use at a reasonable license, "with the same effect as if the patents therefor were included in the list herein set forth." *Held*, that it was the evident intention that, when defendant purchased the machines at the end of the term, it should take them free from the monopoly of the patents listed, and that under the provision quoted this extended to a patent subsequently obtained by complainant for an improvement which was embodied in the machines during the term.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

Suit in equity by the Wickwire Spencer Steel Corporation against the Pittsburgh Steel Corporation. Decree for defendant, and complainant appeals. Affirmed.

William Quinby, of Boston, Mass., and Benjamin H. Pettes, of Pittsburgh, Pa., for appellant.

Robert D. Totten, of Pittsburgh, Pa., and Archworth Martin, of Philadelphia, Pa. (Frederick W. Winter, of Pittsburgh, Pa., of counsel), for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and RUNYON, District Judge.

WOOLLEY, Circuit Judge. The patent in suit, No. 813,823, was granted to J. C. Perry for a machine for making wire goods, better described perhaps as a machine for electrically welding cross or stay wires to longitudinal or strand wires in forming a welded wire fabric. By multiple mechanism the machine is organized to handle any predetermined number of wires at any prearranged spacing. Each strand wire is drawn into the machine between its particular pair of welding jaws and each stay wire is fed across the strand wire by mechanism which may be so adjusted as to bring these wires into the relation necessary to make the kind of wire fabric desired, such as wire fencing, wire concrete re-enforcement, etc.

Speaking of the parties as embracing their predecessors in business and in ownership of the patent, the plaintiff sold the defendant a number of such machines adjusted for making fence fabric. After the purchase the defendant readjusted some of them so that they would turn out concrete re-enforcing fabric. The plaintiff charges that this was an alteration of the machines which in effect changed the old machines into new ones, and these, being within its claims, infringe the patent. It bases its case on the law (which the defendant does not dispute) that "the license granted to a purchaser of a patented combination is to preserve its fitness for use so far as it may be affected by wear or breakage. Beyond this there is no license." Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S.

325, 336, 29 S. Ct. 503, 507 (53 L. Ed. 816); Walker on Patents (5th Ed.) 362, 423, 495. On this law the plaintiff takes the position that the defendant, after acquiring title to the machines, was required to continue to use them with the exact wire arrangement and spacing adjustment they had on the day of sale without any right to respace or vary the number of welding units and thereby make wire fabric of any style other than that for which the machine was then set and adjusted. The defendant concedes that it made changes, not, as we understand, to repair wear and breakage, but such as were necessary to manufacture a slightly varied product. The changes were, we think, substantial, not in the sense of tearing down old machines and building up new ones, but in readjusting their organism to turn out a product of which it was admittedly capable yet which was very different from what the machines made when sold. If this were all the law and all the facts in the case, we are of opinion that the trial court, instead of dismissing the bill, should have found infringement and proceeded to an accounting. But there is something else in the case and this is a contract of license between the parties which is also a contract of sale of the machines in question and which, very properly, influenced the decision of the learned trial court. After studying this contract we are of opinion that, although in form this is an action for infringement involving what was done in violation of the claims of the patent sued upon, the case really turns on the contract between the parties and on its proper construction with reference to the sale of the machines.

Some time prior to December, 1901, the parties to this suit entered into negotiations looking toward the securing by the defendant of machines from the plaintiff for the manufacture of electrically-welded woven-wire fencing. In the course of the negotiations the defendant's officers inspected one of the plaintiff's machines. The defendant's experts considered it impracticable for the defendant's purposes but, nevertheless, felt that if modified along the lines they suggested it could, perhaps, be used by the defendant in the manufacture of welded wire fabric for fencing. The plaintiff made modifications acceptable to the defendant, and the parties, on December 10, 1901, entered into a contract of license under which the plaintiff delivered to the defendant from time to time 43 machines at an "initial rental" varying from $2,250 to $4,637 a machine, and on a royalty of $3 per ton on the

output amounting, during the nearly 17 years of the life of the license, to over $1,800,000.

The contract provided that the license should run for the life of the youngest of twenty-nine patents (identified by their numbers) whose inventions were embodied in the machines; that it should be an exclusive license to the defendant for the manufacture of wire fences but for no other purpose, the plaintiff reserving the right to use similar machines for all other purposes. Although the contract contained a covenant by the defendant "not to add to or subtract from said welding machines any mechanism whatever now or hereafter organized," reorganization of the machines was from time to time made by the defendant with the acquiescence of the plaintiff during the life of the license; never, however, for the purpose of changing the use of the machines from the manufacture of wire fencing to the manufacture of anything else. Finally it was agreed that on the expiration of the license the defendant "shall have the privilege of purchasing said welding machines by the payment therefor of one dollar, and upon such purchase, [the plaintiff] will transfer the property in said welding machines to [the defendant] by a proper bill of sale."

On the ending of the agreement by the expiration of the youngest patent named, the defendant exercised this privilege and the plaintiff by proper bill of sale conveyed the machines to the defendant.

The changes and alterations made by the defendant after its purchase were not in respect to inventions of any of the patents listed in the agreement but in respect to the invention of the patent in suit which was not listed. It transpired that after the machines had been built with the improvements suggested by the defendant's experts in 1901, Perry, the plaintiff's mechanical man, on April 25, 1903, applied for a patent covering these inventive improvements. The patent was granted on February 27, 1906. It was not until December, 1914, that the defendant heard of the patent. Thus it happened that the invention of the patent in suit became embodied in the machines which the defendant operated under the license and then purchased, and that the patent for the invention was not mentioned in the license agreement under whose terms the defendant purchased the machines free of the rights of patents just expired. It is for this reason that the plaintiff says that its after-acquired patent still stands against its invention in-

corporated in the sold machines, for infringement of which by alterations the defendant is liable. But the contract said something more. Dealing with possible future inventions which might be embodied in machines to be delivered to the defendant under the license contract and later to be acquired by purchase, the parties said:

"In case [the plaintiff] acquire any new devices or improvements in electric welding machines that are covered by Letters Patent owned or controlled [by it], the Pittsburgh Steel Company [the defendant] shall have the right to obtain the use of any such device or improvements from them at a reasonable initial license fee, based upon the cost thereof to the [plaintiff] and upon the addition [by the plaintiff] of any new devices or improvements to the welding machines embraced in or subject to this lease and agreement, all the covenants, stipulations and additions herein contained shall apply to the welding machines as modified or altered by said new devices or improvements and to all the patented inventions of the [plaintiff] embodied therein, with the same effect as if the patents therefor were included in the list herein set forth and said additions or alterations were made and had become an integral part of said welding machines at the time of their coming under the operation of this instrument."

It is clear that the parties intended that the plaintiff should retain its patent monopolies on the machines licensed to the defendant throughout the term of the license and that these monopolies embraced not only the patents named in the agreement, but extended to those later issued when their inventions became embodied in the machines. Both parties agreed to this. They also agreed that upon the termination of the contract it was their intention that the defendant should acquire the machines wholly free from the monopoly of the patents listed in the agreement and whose inventions entered into their construction. This being true it appears that by providing that after-acquired patents, whose inventions became embodied in the machines, shall apply to the machines as thereby modified or altered "with the same effect as if the patents therefor were included in the list herein set forth" the parties also meant that upon the expiration of the contract the purchaser should take the machines free from those patents also. Under the provision for future patents we read the license agreement as though patent No. 813,823, here in suit, were listed therein. Reading the contract in this way,

there can be no escape from the conclusion that the defendant on the expiration of the license (which was limited by the expiration of the youngest patent) became the absolute owner of the welding machines with the same force and effect as though the patent in suit also had expired. The expiration of the junior patent in the list being taken by the parties as the measure by which the duration of the license agreement should be limited and the time at which the purchaser should be released from all patent liability, it logically follows that all patent monopolies, those listed in the agreement by numbers and those acquired in the future, which under the agreement were to "have the same effect as if the patents therefor were included in the list," expired as to those machines on the termination of the contract, thereby vesting in the defendant the absolute ownership of the machines free of all contract and patent restrictions.

On this interpretation we affirm the decree below.